IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

SHERWIN I. RAY,                              )
CAREPLUS MANAGEMENT, INC.                    )
CHICAGO CHESED FUND                          )
AGUDAUTH ISRAEL OF ILLINOIS                  )
ALFRED AGHAIEPOUR,                           )
JAKOB BAKST, GERSHON BASSMAN,                )
LAWRENCE BORENSTEIN,                         )
SHARI BORENSTEIN,                            )
BERNARD COHEN, LOIS COHEN,                   )
MARC COHEN,                                  )
FARSH DAVATGAZADEH,                          )
WILLIAM R. DUNAVANT,                         )
LEE FRIEDMAN, FELICE FRAND,                  )
ARI FRIEDMAN                                 )
YOSEF DAVIS, DANIEL GOOZE,                   )
ROBERT GLUCK, YISROEL GLUCK,                 )
ABRAHAM HARTMAN,                             )
TOVA HARTMAN,                                )
BERNARD HOLLANDER,                           )
NACHAMAH JACOBVITS,                          )
ROSEMARY KAYNE,                              )
SANFORD KAYNE,                               )
SHARAM KOHANANOO,                            )
JOSEPH KNOPF, ALAN M. KNOPF,                 )
MICHAEL KNOPF, HILDA LOEW,                   )
YECHIEL LANDAU,                              )
HERSCHEL LICHTMAN                            )
ISRAEL LICHTSHEIN,                           )
NAVA LICHTSHEIN,                             )
LINCOLN AVE SHOES INC.                       )
BARBARA MADNICK                              )
MARGOLIES CLINIC                             )
HENRY MERMELSTEIN,                           )
JOSEPH MERMESTEIN,                           )
MARVIN MERMELSTEIN,                          )
GEORGE OFMAN, DOV PEIKES,                    )
CHAIM RAJCHENBACH                            )
MOSHE RAJCHENBACH                            )     IN ACCORDANCE WITH RULE 38, TRIAL
JACK RAJCHENBACH                             )     BY JURY IS HEREBY DEMANDED
NAOMI RAJCHENBACH,                           )

03C 3157

RAJCHENBACH TRUST,                          )
BARRY RAY, HELEN RAY,                       )
JOSHUA RAY, SHARON RAY,                     )
AMY RAY TRUST, JORDAN RAY,                  )
CHAIM RAY, ELIMELECH RAY,                   )
MALKA RAY,                                  )
BERNARD ROSENBERG,                          )
DAVID ROSENBERG,                            )
JOEY STERN TRUST,                           )
YESHIVA TELSHE                              )
TORAH ACADEMY,                              )
TORAH ACADEMY ENDOWMENT,                    )
TORAH ACADEMY OF MINNESOTA,                 )
ARYEH WEINBERG,                             )
DOUGLAS METCALF,                            )
ROBERT METCALF                              )
MARK STEWART, SUSAN STEWART,                )
SANDI STEWART, ANNE STEWART,                )
ANANTHA AGASTHYA,                           )
RICHARD ALTDOEFFER,                         )
AM. CRYSTALLOGRAPHIC ASSOC.,                )
CAROL A. AYERS, PAUL BARNES,                )
M. WILENE BARNES, JOHN BARTON,              )
STANLEY BIRCH,                             )
H.K. BLOCH IRREV. TRUST,                    )
B.U. HABIB RETIREMENT PLAN,                 )
BOB CRAVENS REVOC. LIV. TRUST,              )
BRIAN D. TIPTON,                            )
EASTLAND EYECARE,                          )
EASTLAND OPTICAL,                          )
GWENDOLYN BRAND,                            )
FONDA BROUSSEAU,                           )
BEN B. BUCKLAND, TRACY BUGG,                )
DR. K. CHANDRASEKARAN,                      )
JAY CLARK,                                  )
CLEVELAND REVOC. LIV. TRUST                 )
RANDY COCKLIN,                             )
BART COOKE, CHARYL COOKE,                   )
BOB CRAVENS TRUST,                          )
ANDREW DAVIS, DIANE DAVIS,                  )
JUDITH DAVIS, JOANN DRUM,                   )
EDMOND PUBLIC SCHOOLS FOUND.,               )
BRAD EFAW COMPUTERS,                        )

2

BRADLEY EFAW, MARY JO EFAW, )
EVELYN ETTER REVOC. LIV. TRUST, )
JIMMY FLETCHER, RUTH FOSTER, )
CHARLES FUNDERBURK, )
M. GHAZNAVI, MD, )
J. GHAZNAVI, MD, )
WILLIAM GLASS, N. JEAN GLASS, )
VICKI GREEAR, MARY GREEAR, )
LARRY GRIFFIN, SHARLA GRIFFIN, )
NORMAN HARTLEY, DORIS HILL, )
FREDEAN HOOKER, KAREN JONES, )
ANNAH KING MPP. & TRUST, )
JERRY KING, J. & S. KINDER )
NORAH LUKER, O.R. LUKER, )
O.R./NORAH LUKER REV. LIV TRUST, )
LOREN MENNEM, LESLIE A. MENNEM,)
JAMES MCGILL, K.R. MERIWETHER, )
V. L. MILLER, )
V.L. MILLER REVOC. LIV. TRUST, )
RON MITCHELL, MILTON MOONEY, )
GARY MOORE, RITA MOORE, )
BRIAN MORGAN, E. MOSER, )
R. A. MOSLEY, R.J. NALL, )
CONNIE NALL, JANET NEYER, )
LEO NEYER, M. N. NICHOLSON, )
MARLENE PANSZE, )
M. PANSZE REVOC. LIV. TRUST, )
GAIL PARK, SAM PARK, )
C.J. PRICE, S.N. RAO, S. ROHRER, )
BRANDI ROOT, JESSICA ROOT, )
WANDA SCHERLER, )
RICHARD SCHERLER, )
CHARLES SCHMIDT, GARY SEAL, )
DEBBIE SEELEY, )
SEELEY LIVING TRUST, )
MINNIE SOAPES, A. STEWART, )
SCOTT STRELLER, GENE STRELLER, )
MARY STRELLER, )
CHARLES SULLIVAN, )
SUSANNE SULLIVAN, )
DANNY TEACHMAN, CHARLES TEW, )
JIM TEROW, D. BRENT TIPTON, )
ARCHARYULU VEDALA, )

3

STEVE WALDO, ONETA WARD, )
D. WHITTINGTON, )
Y. HILGENBERG REVOC. LIV. TRUST, )
ANN WILSON, PAULINE WILSON, )
R/P WILSON REVOC. LIV. TRUST, )
JAFFREY ZAFAR, CAROLYN GLOVER, )
PAUL GLOVER, SCOTT JACOBSON, )
GLOVER INTERN. FOUNDATION, )
TERI JONES, )
CHRISTINE NEKEREROFF, )
ANTHONY W. ARMENTA, )
MARGA ARMENTA, )
BIG SOLUTIONS, MONEY CIRCLE, )
DONALD ASHER, )
RUDI BIANCHI, JOHN BONDE, )
SIMON CITTONE, JOHN COSTELLO, )
LENKA DANOFF, )
RANDY DREW, STEVEN DREW, )
MARK DURANTE, JAMES HESS, )
STEVEN HERNANDEZ, )
GABRIELLA ITO, DAVID MAY, )
MICHAEL KAHN, )
LEON IND INT'L CORP. )
JAMES MCFADDEN, )
THOM MCFADDEN, )
TYLER MCFADDEN, )
WILL MCFADDEN, )
J. DOUGLAS MCNAIR, )
BRAD NICOLAISEN, )
MIA NICOLAISEN, JOHN NICOLAISEN, )
ARMANDO PEREZ, PRAYAG PRASAD, )
ANTON PILS, MARK RAUSSEO, )
SCOTT SHEPPARD, )
STANLEY K. SHEPPARD, )
LISA TETEAK, )
B.J UKRA, MARK UKRA, )
MICHAEL WIEDDER, ERWIN VOGEL, )
JAMIE WILKIE, ROBERT WOOG )
                                      )
                    Plaintiffs,       )        CIVIL ACTION
                                      )
          v.                          )        NO.
                                      )

4

CITIGROUP GLOBAL MARKETS, INC., )
f/k/a Salomon Smith Barney, Inc., )
CITIGROUP, INC., )
and )
JOHN HENRY SPATZ, )
)
                         Defendants. )

## COMPLAINT

Plaintiffs, Sherwin I. Ray, Careplus Management, inc., Chicago Chesed Fund, Agudauth

Israel of Illinois, Alfred Aghaiepour, Jakob Bakst, Gershon Bassman, Lawrence Borenstein, Shari

Borenstein, Bernard Cohen, Lois Cohen, Marc Cohen, Farsh Davatgazadeh, William R. Dunavant,

Ari Friedman, Lee Friedman, Felice Frand, Yosef Davis, Daniel Gooze, Robert Gluck, Yisroel

Gluck, Abraham Hartman, Tova Hartman, Bernard Hollander, Nachamah Jacobvits, Rosemary

Kayne, Sanford Kayne, Sharam Kohananoo, Joseph Knopf, Alan M. Knopf, Michael Knopf, Yechiel

Landau, Hilda Loew, Herschel Lichtman, Israel Lichtshein, Nava Lichtshein, Lincoln Ave Shoes

Inc., Barbara Madnick, Margolies Clinic, Henry Mermelstein, Joseph Mermelstein, Marvin

Mermelstein, George Ofman, Dov Peikes, Chaim Rajchenbach, Moshe Rajchenbach, Jack

Rajchenbach, Noami Rajchenbach, Rajchenbach Trust, Barry Ray, Helen Ray, Joshua Ray, Sharon

Ray, Amy Ray Trust, Jordan Ray, Chaim Ray, Elimelech Ray, Malka Ray, Bernard Rosenberg,

David Rosenberg, Jocy Stern Trust, Yeshiva Telshe, Torah Academy, Torah Academy Endowment,

Torah Academy of Minnesota, Aryeh Weinberg, Douglas Metcalf, Robert Metcalf, Mark Stewart,

Susan Stewart, Sandi Stewart, Anne Stewart, A. Agasthya, Richard Altdoeffer, American

Crystallographic Association, Carol A. Ayers, Paul Barnes, M. Wilene Barnes, John Barton, Stanley

Birch, H.K. Bloch Irrevocable Trust, B.U. Habib Retirement Plan, Bob Cravens Revocable Living

Trust, Brian D. Tipton, Eastland Eyecare, Eastland Optical, G. Brand, Fonda Brousseau, Ben B.

Buckland, Tracy Bugg, Dr. K. Chandrasekaran, J.P. Clark, F.A. Cleveland Revocable Living Trust, Randy Cocklin, Bart Cooke, Charyl Cooke, Bob Cravens Trust, Andrew Davis, Diane Davis, Judith Davis, Joann Drum, Edmond Public Schools Foundation, Brad Efaw Computers, Brad Efaw, Mary Jo Efaw, Evelyn Etter Revocable Living Trust, Jimmy Fletcher, Ruth Foster, C. Funderburk, M. Ghaznavi, J. Ghaznavi, William Glass, The Glass Trust, N. Jean Glass, Vicki Greear, Mary Greear, Larry Griffin, Sharla Griffin, Norman Hartley, Doris Hill, Fredean Hooker, Karen Jones, Annah King MPP & Trust, Jerry King, J. & S. Kinder, Norah Luker, O.R. Luker, O.R/ and Norah Luker Revocable Living Trust, Loren Mennem, Leslie A. Mennem, James McGill, K.R. Merriweather, V.L. Miller, V.L. Miller Revocable Living Trust, Ron Mitchell, Milton Mooney, Gary Moore, Rita Moore, Brian Morgan, E. Moser, R.A. Mosley, R.J. Nall, Connie Nall, Jenet Neyer, Leo Neyer, M.N. Nicholson, Marlene Pansze, M. Pansze Revocable Living Trust, Gail Park, Sam Park, C.J. Price, S.N. Rao, S. Rohrer, Brandi Root, Jessica Root, Wanda Scherler, Richard Scherler, C. Schmidt, Gary Seal, Debbie Seeley, Seeley Living Trust, Minnie Soapes, A. Stewart, Scott Streller, Gene Streller, Mary Streller, Charles Sullivan, Susanne Sullivan, Danny Teachman, Charles Tew, Jim Terow, D. Brent Tipton, A. Vedala, Steve Waldo, Oneta Ward, D. Whittington, Y. Hilgenberg Revocable Living Trust, Ann Wilson, Pauline Wilson, R.P. Wilson Revocable Living Trust, Jaffrey Zafar, Carolyn Glover, Paul Glover, Scott Jacobson, Glover International Foundation, Teri Jones, Christine Nekereroff, Anthony W. Armenta, Marga Armenta, Donald Asher, Rudi Bianchi, John Bonde, Big Solutions, Money Circle, Simon Cittone, John Costello, Lenka Danoff, Randy Drew, Steven Drew, Mark Durante, Steven Hernandez, James Hess, Gabriella Ito, Michael Kahn, Leon Ind. Int'l Corp., James May, James McFadden, Thom McFadden, Tyler McFadden, Will McFadden, J. Douglas McNair, Brad Nicolaisen, Mia Nicolaisen, John Nicolaisen, Armando Perez, Prayag Prasad, Anton

Pils, Mark Rausseo, Scott Sheppard, Stanley K. Sheppard, Lisa Teteak, B.J. Ukra, Mark Ukra, Erwin

Vogel, Michael Wiedder, Jamie Wilkie, and Robert Wood (collectively, the "Plaintiffs"), by counsel,

file the following Complaint against Defendants, Citigroup Global Markets, Inc. f/k/a Salomon

Smith Barney, Inc., Citigroup, Inc., and John Henry Spatz, jointly and severally.

Plaintiffs seek compensatory and punitive damages in the total amount of $124,500,000.00.

### Jurisdiction and Venue

The Court has jurisdiction of this matter pursuant to 28 U.S.C. § 1331 and 1332 and 28

U.S.C. § 1367. Venue is proper in the United States District Court for the Northern District of

Illinois, Eastern Division. 28 U.S.C. § 1391. Defendants are subject to personal jurisdiction in

Illinois.

### Summary of the Claims and Losses

This is an action for securities fraud and conspiracy arising out of Citigroup's

misrepresentations, omissions, unethical business practices, conflicts of interest, and recklessly

negligent advice concerning the Plaintiffs' investment in a public company called SmartServ Online,

Inc. ("SSOL").

Between approximately January 2000 and May 2002, Citigroup and its top institutional

broker, John Henry Spatz, in combination with insiders at SSOL, a fund manager at Morgan Stanley

and others, engaged in a repeated pattern of fraud specifically intended to deceive the Plaintiffs into

purchasing shares of SSOL and holding their positions. Citigroup and Spatz knowingly and

recklessly deceived the Plaintiffs and many other retail investors[1] and concealed massive and

---

[1]     There is an Arbitration pending before the National Association of Securities Dealers
("NASD") involving twenty-five (25) additional investors in SSOL who allege the same claims against
Citigroup and Spatz. Those investors lost over $10,000,000 in retirement and life savings as a result of

irreconcilable conflicts of interest. Spatz used his position as an "institutional" salesperson to influence retail brokers to recommend SSOL to their customers. Spatz intentionally used the retail public to fraudulently prop up and artificially inflate the stock price, so he could earn business for Citigroup and advance his own self-interest. In May 2002, at a time when Spatz expressly advised the Plaintiffs to "buy more" and "hold" SSOL, Spatz knew that at least one of Citigroup's institutional clients, a mutual fund managed by Morgan Stanley, was dumping its shares of SSOL on the open market and that the CEO of SSOL was being sold out on margin by Citigroup. When questioned about the selling, Spatz falsely advised the Plaintiffs that it was "just retail orders." Spatz intentionally lied about sales of SSOL by Morgan Stanley and company insiders.

Plaintiffs unknowingly held their shares and bought into a sell off which crushed the stock price down to a dollar.

Other examples of how Citigroup and Spatz manipulated SSOL and defrauded the Plaintiffs are legion: Citigroup misrepresented to the Plaintiffs that SSOL had finalized major "deals" with investors, such as Microsoft, Verizon, Qualcomm, and others, which guaranteed multi-million dollar revenues that would dramatically increase the stock price of SSOL. Citigroup misrepresented that it intended to invest "heavily" in SSOL and that it was going to extensively utilize SSOL's products "firm wide." Citigroup misrepresented that it intended to initiate coverage on the stock, falsely conveying the impression that there was institutional backing for SSOL. Because of Citigroup's "firm" backing, Spatz recklessly advised that SSOL was worth $300/share, at a "minimum."

---

Citigroup's misrepresentations. Commonwealth Holdings, Inc., *et al.* v. Citigroup Capital Markets and Spatz, NASD Dispute Resolution No. 02-6802 (the "NASD Arbitration").

When the Plaintiffs inquired about selling SSOL in the range of $40-50 per share, Spatz advised the Plaintiffs that they would be "fools" to get out of SSOL. "Buy," "Buy more," "hold," and "do not sell" were the only words Spatz ever used. Citigroup and Spatz represented to the Plaintiffs that they were not at risk, that SSOL was a safe investment, and that Plaintiffs should continue to "hold" the stock. Spatz advised the Plaintiffs that SSOL was such a good investment, in fact, that Spatz had put all his father's retirement money in the stock and had even purchased shares for his children. Spatz assured the Plaintiffs by stating, "Why would I put my family in this stock [if it wasn't a sure thing]? I have to protect them as well."

Citigroup and Spatz induced the Plaintiffs to purchase and hold over $24,500,000 worth of SSOL.

Plaintiffs' shares are worth $0.69 per share as of the close on May 1, 2003.

On July 9, 2002, President Bush emphatically declared war on securities fraud. Bush took after stockbrokers like Citigroup who have mislead clients in order to inflate stock prices. "'Buy' should not be the only word in an analyst's vocabulary, and they should never say 'hold' when they really mean 'sell'." On July 19, 2002, President Bush again counseled the nation that "unethical business practices by corporate leaders amount to theft and fraud...We will not accept anything less than complete honesty."

The Defendants epitomize the corporate mentality the Bush Administration and the SEC is trying to eradicate. It is because of Citigroup and institutional brokers like John Spatz that investor confidence is at an all-time low.

### **The Plaintiffs**

1.      Plaintiffs, Sherwin I. Ray, Careplus Management, Inc., Chicago Chesed Fund, Agudauth Israel of Illinois, Alfred Aghaiepour, Jakob Bakst, Gershon Bassman, Lawrence Borenstein, Shari Borenstein, Bernard Cohen, Lois Cohen, Marc Cohen, Farsh Davatgazadeh, William R. Dunavant, Ari Friedman, Lee Friedman, Felice Frand, Yosef Davis, Daniel Gooze, Robert Gluck, Yisroel Gluck, Abraham Hartman, Tova Hartman, Bernard Hollander, Nachamah Jacobvits, Rosemary Kayne, Sanford Kayne, Sharam Kohananoo, Joseph Knopf, Alan M. Knopf, Michael Knopf, Yechiel Landau, Hilda Loew, Herschel Lichtman, Israel Lichtshein, Nava Lichtshein, Lincoln Ave Shoes Inc., Barbara Madnick, Margolies Clinic, Henry Mermelstein, Joseph Mermelstein, Marvin Mermelstein, George Ofman, Dov Peikes, Chaim Rajchenbach, Moshe Rajchenbach, Jack Rajchenbach, Noami Rajchenbach, Rajchenbach Trust, Barry Ray, Helen Ray, Joshua Ray, Sharon Ray, Amy Ray Trust, Jordan Ray, Chaim Ray, Elimelech Ray, Malka Ray, Bernard Rosenberg, David Rosenberg, Joey Stern Trust, Yeshiva Telshe, Torah Academy, Torah Academy Endowment, Torah Academy of Minnesota, and Aryeh Weinberg (collectively, the "Illinois Plaintiffs") reside in Illinois and/or transact business in Illinois.

2.      The Illinois Plaintiffs purchased approximately $15,500,00.00 of SSOL in direct reliance upon Citigroup and Spatz's fraud and misrepresentations. The Illinois Plaintiffs purchased their shares of SSOL in Illinois.

3.      The Illinois Plaintiffs are clients of the firm, David A. Noyes & Company, in Skokie, Illinois ("David Noyes"). Their broker is Howard Borenstein ("Borenstein").

4.      Plaintiff, Douglas Metcalf, lives in Massachusetts. He is a venture capitalist. Plaintiff, Robert Metcalf, is Douglas' father. As with the Illinois Plaintiffs, Spatz's

misrepresentations and omission caused the Metcalfs to purchase, hold and lose over $1,250,000 on

SSOL. Over $250,000 of this was Robert Metcalf's retirement money.

5.     Plaintiffs, Mark Stewart, Susan Stewart, Sandi Stewart, Anne Stewart, A. Agasthya,

Richard Altdoeffer, American Crystallographic Association, Carol A. Ayers, Paul Barnes, M. Wilene

Barnes, John Barton, Stanley Birch, H.K. Bloch Irrevocable Trust, B.U. Habib Retirement Plan, Bob

Cravens Revocable Living Trust, Brian D. Tipton, Eastland Eyecare, Eastland Optical, G. Brand,

Fonda Brousseau, Ben B. Buckland, Tracy Bugg, Dr. K. Chandrasekaran, J.P. Clark, F.A. Cleveland

Revocable Living Trust, Randu Cocklin, Bart Cooke, Charyl Cooke, Andrew Davis, Diane Davis,

Judith Davis, Joann Drum, Edmond Public Schools Foundation, Brad Efaw Computers, Brad Efaw,

Evelyn Etter Revocable Living Trust, Jimmy Fletcher, Ruth Foster, C. Funderburk, M. Ghaznavi,

J. Ghaznavi, William Glass, The Glass Trust, N. Jean Glass, Vicki Greear, Mary Greear, Larry

Griffin, Sharla Griffin, Norman Hartley, Doris Hill, Fredean Hooker, Karen Jones, Annah King MPP

& Trust, Jerry King, J. & S. Kinder, Norah Luker, O.R. Luker, O.R/ and Norah Luker Revocable

Living Trust, Loren Mennem, Leslie A. Mennem, James McGill, K.R. Merriweather, V.L. Miller,

V.L. Miller Revocable Living Trust, Ron Mitchell, Milton Mooney, Gary Moore, Rita Moore, Brian

Morgan, E. Moser, R.A. Mosley, R.J. Nall, Connie Nall, Jenet Neyer, Leo Neyer, M.N. Nicholson,

Marlene Pansze, M. Pansze Revocable Living Trust, Gail Park, Sam Park, C.J. Price, S.N. Rao, S.

Rohrer, Brandi Root, Jessica Root, Wanda Scherler, Richard Scherler, C. Schmidt, Gary Seal,

Debbie Seeley, Seeley Living Trust, Minnie Soapes, A. Stewart, Scott Streller, Gene Streller, Mary

Streller, Charles Sullivan, Susanne Sullivan, Danny Teachman, Charles Tew, D. Brent Tipton, A.

Vedala, Steve Waldo, Oneta Ward, D. Whittington, Y. Hilgenberg Revocable Living Trust, Ann

Wilson, Pauline Wilson, R.P. Wilson Revocable Living Trust, Jaffrey Zafar, Carolyn Glover, Paul

11

Glover, Scott Jacobson, Glover International Foundation, Teri Jones, and C. Nekereroff (collectively, the "Oklahoma Plaintiffs") reside in Oklahoma.

6.     The Oklahoma Plaintiffs are clients of the firm, GunnAllen Financial, Inc. in Edmond, Oklahoma ("GunnAllen"). Their individual broker is Mel Stewart ("Stewart"). The Oklahoma Plaintiffs relied upon the same misrepresentations and omissions as the Metcalfs and the Illinois Plaintiffs, and lost over $1,800,000 on SSOL stock and warrants.

7.     Plaintiffs, Anthony W. Armenta, Marga Armenta, Donald Asher, Rudi Bianchi, John Bonde, Big Solutions, Money Circle, Simon Cittone, John Costello, Lenka Danoff, Randy Drew, Steven Drew, Mark Durante, Steven Hernandez, James Hess, Gabriella Ito, Michael Kahn, Leon Ind. Int'l Corp., James May, James McFadden, Thom McFadden, Tyler McFadden, Will McFadden, J. Douglas McNair, Brad Nicolaisen, Mia Nicolaisen, John Nicolaisen, Armando Perez, Prayag Prasad, Anton Pils, Mark Rausseo, Scott Sheppard, Stanley K. Sheppard, Lisa Teteak, B.J. Ukra, Mark Ukra, Erwin Vogel, Michael Wiedder, Jamie Wilkie, and Robert Woog (collectively, the "California Plaintiffs") reside in California and Illinois, respectively. The California Plaintiffs are clients of National Securities Corporation. Their individual broker was Angelo Armenta ("Armenta"). The California Plaintiffs purchased and held over $4,500,000 worth of SSOL between 2000 and 2002.

8.     Each of the Plaintiffs purchased shares of SSOL and were dissuaded from selling the stock because of the misrepresentations made by Citigroup and its institutional broker, John Spatz. Even more significant than the misrepresentations, however, were the omissions. Plaintiffs held their shares and bought more because of the deliberate and calculated effort of Spatz to conceal the truth about Citigroup's institutional clients and Citigroup's own "investment" in SSOL.

9.     Plaintiffs' shares are currently worth less than $0.70 per share.

10.     In this case, the Plaintiffs' out-of-pocket losses on SSOL alone exceed $24,500,000.00.

## SmartServ Online

11.     SmartServ Online, Inc. (NasdaqNMS: SSOL) provides Web and wireless applications and infrastructure that allow financial institutions, network service providers and other businesses to deliver content and transaction-intensive services to their work forces and customers in real time and via virtually any wired or wireless device.

12.     SSOL's products include a transaction processing engine, capable of routing high-volume transactions to multiple destinations; proprietary W2W Middleware that ensures content and applications are optimized for the full array of present and future devices; and a suite of applications designed so businesses and their customers can fully exploit the merits of wireless data exchange and transactional capability.

13.     Citigroup and Spatz repeatedly represented that SSOL's product was "unique to the market," "ahead of the market," "nobody compared," and SSOL's product was "the only one that will be bought because it is functioning within all the parameters." Each of these representations caused the Plaintiffs to purchase shares of SSOL. Each of these representations was knowingly false. In internal "Equity Research" (see below), Citigroup actually acknowledged that SSOL was not unique and that it had numerous competitors, whom Citigroup actually considered superior to SSOL.

14.     Beginning in October 1999, the price per share of SSOL began to rise.

15.     Between October 1, 1999 and May 2000, SSOL went from $0.75 to $186.00, and back down to approximately $70.00 per share.

16.     Upon information and belief, the meteoric rise of SSOL was as a result of an orchestrated "short squeeze" of which the Defendants knew and actively participated.

### Citigroup

17.     Defendant, Citigroup Global Markets, Inc., f/k/a Salomon Smith Barney, Inc. ("Citigroup"), is a global, full-service financial firm, which provides brokerage, investment banking, and asset management services to corporations, governments and individuals around the world. Citigroup is a New York corporation with branch offices in the Chicago, Illinois. Citigroup transacts substantial business in Illinois and derives substantial revenue from clients and customers in Illinois. Citigroup is a wholly-owned subsidiary of Defendant, Citigroup, Inc. (NYSE: C).

18.     Citigroup is the second largest retail brokerage firm in the nation. Citigroup holds itself out to the public as a "leader in the U.S. securities industry."

19.     Defendant, John Henry Spatz ("Spatz"), lives in New Jersey. Spatz is an institutional stockbroker employed by Citigroup. At all times material to this action, Spatz was acting within the scope of his employment with Citigroup.

20.     Spatz is not a retail broker. Spatz is an institutional salesman. In this case, Spatz used retail brokers, like Borenstein, to promote SSOL and prop up the stock. Spatz actively recruited and solicited Borenstein and other retail stockbrokers to convey information about SSOL, including "buy" recommendations, to their clients. Spatz intended that Borenstein, Stewart, Armenta, and other stockbrokers would act as conduits and he knew that they were selling SSOL to the Plaintiffs based upon guidance and information he (Spatz) was providing.

21.     At all times, Spatz knew that Borenstein, Stewart, and Armenta were acting as agents for the Plaintiffs in connection with the purchase and sale of SSOL.

14

22.    Spatz personally promoted the stock to Plaintiffs, Sherwin Ray and Douglas Metcalf, who alone purchased over $6,000,000 worth of SSOL.

23.    In addition to Borenstein, Stewart, and Armenta, Spatz also used retail brokers his own firm, Citigroup, as vehicles to reach an unsuspecting retail public.

24.    Up to May 2000, the main Citigroup broker being fed information by Spatz concerning SSOL was Anthony Louis DiGregorio, Jr. ("DiGregorio"). DiGregorio accumulated a very large position in SSOL, personally and for Citigroup clients.

25.    DiGregorio received his information about SSOL from Spatz.[2]

### Anthony Louis DiGregorio

26.    In 1999, DiGregorio had contacted SSOL and spoke with its CEO, Sebastian Cassetta ("Cassetta"). That is where he first heard of Spatz. DiGregorio learned that Spatz was in institutional sales at Citigroup. DiGregorio contacted Spatz through Citigroup's corporate directory to confirm his involvement in SSOL.

27.    Spatz represented to DiGregorio that he was both an equity holder **_and_** was an institutional buyer of the stock for "some of his clients." Spatz stated that he was in regular contact with Cassetta, either by phone or in person. Spatz professed to have an in depth working knowledge of SSOL and an expertise in that technology space. DiGregorio spoke with Spatz about once or twice a month.

28.    In early 2000, Spatz represented to DiGregorio that Bill Gates, Chairman of Microsoft, was taking an equity stake in SSOL. Spatz stated that Hambrecht & Quist had become

---

[2]    DiGregorio is still employed by Citigroup. DiGregorio is a Claimant in the NASD Arbitration.

a market maker and that DiGregorio should "look out" for a volume breakout in the stock. Spatz knew that DiGregorio was recommending the purchase of SSOL to his Citigroup retail clients based upon Spatz's representations. Unbeknownst to DiGregorio, the representations were false.

29.     In June 2000, Spatz advised DiGregorio that now that the Hewlett Packard announcement was out, institutional buying would come into the stock. He represented that Microsoft, Nokia and Motorola already had "an interest" in the company.

30.     These representations, and others to follow, were not only false, but were part of a pattern of fraudulent statements. Metcalf and others heard the same misrepresentations.

31.     Later in the year, Spatz represented that Barclays Bank and Citigroup had significantly "raised" their institutional holdings in the company. Spatz's representation that Barclays and Citigroup had increased their institutional investments in SSOL convinced DiGregorio to stay with the stock, even though the stock price was down. The representations were false. Citigroup, Inc. (the parent company) never had an interest in SSOL and Barclay's Bank sold its investment prior to the time Spatz made his representations. Spatz knew or should have known that his statements to DiGregorio were false. Spatz did no investigation and had no basis whatsoever for stating that Citigroup, Inc. and Barclays had significantly increased their institutional holdings.

32.     On January 4, 2001, Spatz told DiGregorio that he (Spatz) would "ride hard" with the company this year.

33.     In June 2001, Spatz represented that he was "personally" going to "carry out the shorts on stretchers." He opined that the stock would be at $30-50 per share by September because companies like JP Morgan, Morgan Stanley, Bear Stearns, and Hutchinson Wampoa all had interests in SSOL.

16

34.     Spatz also kept DiGregorio on the hook by telling him that Citigroup had cut a "deal" with SSOL. Spatz represented that "substantial recurring revenues" would result from that contract.

35.     Significantly, Spatz told DiGregorio that Sanford Weill, Chairman and CEO of Citigroup, Inc. ("Weill"), sold his $30 million investment in 724 Solutions, Inc. ("SVNX"), a competitor of SSOL, when it was realized that SVNX's technology "did not work" and SSOL's was "far superior." These representations were patently false. Not only did Citigroup cover SVNX, but Spatz had internal "Equity Research" which indicated that SSOL was not "far superior" to anyone in the wireless group. The comments about Weill were particularly important to DiGregorio. Upon information and belief, Weill did not sell his stake in SVNX (if indeed he ever had one) for the reason stated by Spatz. In fact, there is no public record of any sale by Weill personally. In early 2001, a Citigroup, Inc. affiliate filed a Schedule 13G disclosing beneficial ownership of only 5,235,000 shares of SVNX, 665,750 of which were sold on or about July 22, 2001.

36.     Citigroup and Spatz actively attempted to make SSOL "superior" to competitors, like SVNX, even if that meant acting contrary to the interests of Citigroup's own investment banking clients. Upon information and belief, in furtherance of his efforts to promote SSOL, Spatz obtained from Citigroup confidential information about competitors, like SVNX, which Spatz then supplied to SSOL. SSOL then used this information to solicit business. Spatz was deeply involved with SSOL.

37.     When DiGregorio saw that Citigroup was making a market in SSOL, he contacted Spatz. Spatz reiterated that it was a "very bullish" sign and that DiGregorio should definitely expect research coverage. The same representation was repeated to Borenstein and Stewart.

17

38.     Spatz induced DiGregorio and his retail clients to purchase over $1,200,000 worth of SSOL.

39.     In April 2000, a rumor circulated that Citigroup, Microsoft, Nextel and others "loved" SSOL, and were looking to provide financing through an upcoming private placement. SSOL had just had a meteoric rise from $2 to $186, and was settling in the $100-120 range, when the rumor first began to circulate.

40.     Spatz originated the rumor. Spatz was selectively leaking this "information" to "friends of the company" and some of Citigroup's big producing retail brokers in order to drum up support for the stock.

41.     The representations concerning Nextel were false. Nextel did not "love" SSOL's product. On May 4, 2000, in response to a request from SSOL to consider using its product on a "trial basis," Nextel commented internally that it "didn't really see anything different from what we get from MSN. Not really interested in providing the same content AGAIN to our customers." On January 25, 2002, SSOL submitted a proposal to Nextel, which, upon information and belief, was not accepted. Nextel never intended to provide financing to SSOL. The true interest of Nextel, Microsoft and the others was concealed from the Plaintiffs. There was no basis for Spatz's representation that Nextel "loved" SSOL or that it intended to provide any financing.

42.     Another representation made by Spatz and generally circulated was that SSOL was going to be taken over. Spatz specifically stated that the suitor was "Ariba" (NasdaqNM: ARBA). The takeover rumor was false, but it kept the Plaintiffs on the hook.

18

43.    After May 2000 and through May 2002, Spatz began using at least two (2) other Citigroup retail brokers, Francis X. Weber, Jr. ("Weber") and Charles E. Menacho ("Menacho"),[3] as conduits to the retail investing public.

44.    Spatz bragged that he had been very successful in the stock market over the years. One year, he earned a "million dollar" commission.

45.    Spatz emphasized that he sold stock "to the institutions," and that he had an in-depth knowledge of "telecommunications," "Internet" and "wireless" "applications and infrastructure." Spatz represented that he had fully researched and analyzed numerous companies in this investment "group," including SSOL and "all" of SSOL's competitors. Spatz represented that he was extremely knowledgeable in all matters relating to these investments. "These are the things I follow." Spatz held himself out as an expert. Spatz said he "recommended stock to everyone."

46.    Borenstein, Stewart, Armenta, DiGregorio, Weber, Menacho, and the retail investors, like Ray and Metcalf (who Spatz contacted directly), relied upon Spatz's professed expertise and his representations concerning the supposed relationship between SSOL and Citigroup. According to Spatz, Cassetta was "so well liked" at Citigroup that it was like a "love affair."

47.    Spatz further advised that SSOL was a "financially sound" investment, so sound in fact that Spatz had put his "family" and all his "father's retirement" in the stock. Spatz used the "family" connection to induce the retail brokers to get their extended family of clients involved with SSOL.

---

[3]    Menacho's brother, John Menacho, heard Spatz say in the spring of 2000 that "deals" with Citigroup, Microsoft, IBM, and others were "done." These representations were demonstrably false. The Citigroup deal was not done until December 2001. The only material announcement concerning Microsoft came on October 11, 2000, when SSOL announced that it would "Demo Real-Time Financial Services Applications At Microsoft Exchange Conference."

48.    Each of Borenstein, Stewart, Armenta, and the Citigroup retail brokers advised their clients that all information about SSOL came from Spatz.

49.    The Plaintiffs trusted and relied upon Spatz's representations about his family and, as a direct result, were willing to put their own retirement funds in SSOL. Plaintiffs believed that an institutional stockbroker, like Spatz, with such an in-depth knowledge of the industry and track record of success would not have put his own family at risk. Spatz's representations and assurances made the Plaintiffs feel safe about their investment in SSOL. Spatz made the Plaintiffs want to continue to hold the securities and buy more.

50.    Spatz represented that the shares owned by the Plaintiffs and by Weber's clients would be "dwarfed" by the institutional buying he was bringing in to SSOL.

### The Misrepresentations and Omissions

51.    Between 2000 and June 2002, when the Plaintiffs discovered that Spatz had openly lied about SSOL, Citigroup and Spatz, *inter alia*, made the following misrepresentations of material fact to the Plaintiffs:

- SSOL has signed ("inked") "major" deals with industry giants, such as Microsoft, Verizon, Hutchison Wampoa, Hewlett-Packard, IBM and others, which deals are "going to launch this stock."

- SSOL's has multiple sources of substantial revenues.

- Three to five percent of all Verizon customers (between 1.5 and 2 million persons) are going to be using SSOL's content and services and each will pay an average price of $5 per month. SSOL will earn at least $54,000,000 from Verizon alone and the Verizon contract will generate at least $2.50 per share earnings. "That easily makes this a $60.00 stock. Do not sell it now."

- SSOL has secured over "$23,000,000.00" in financing from its lenders and investors, and is never going to need any more money.

- Citigroup is investing in SSOL and is going to use SSOL's technology "firm wide."

- Citigroup is going to initiate coverage on SSOL.

- Spatz had brought his institutional "clients" into SSOL.

- Because of the contracts and revenues and Citigroup's endorsement, SSOL is one of the biggest "winners" of 2000, and is "on its way to $500/share."

52.     It was especially significant to the Plaintiffs that Citigroup was going to invest in SSOL and initiate coverage on the stock. The Plaintiffs believed that if a major stockbroker, like Citigroup, provided sponsorship to SSOL, the stock was: (a) financially sound with excellent prospects and worthy of major support; and (b) other brokers would follow suit and recommend SSOL to their clients as well.

53.     Spatz repeatedly talked about the "transaction fees" from the deals and technically how these fees translated into massive revenues (over $100,000,000 annually) for SSOL. Spatz references to the "technical" aspects of the deals was particularly convincing.

54.     Each of Citigroup and Spatz's representations was false and materially misleading at the time they were made. For instance:

- The "deals" were not "done" in 2000 as Spatz had represented. The "contracts" were not on the desk of SSOL's "VP" or Citigroup's counsel "to be signed."

  Deals of some sort were signed eventually, but not until after the Plaintiffs suffered massive losses and after SSOL had been reduced to a penny stock.

- Significantly, the "deals" were not what Spatz represented them to be. Most were not even revenue generating. In the case of Hewlett-Packard, the "deal" was simply a "co-marketing" venture.

- The deals did not produce the substantial revenues Spatz represented they would. Rather, the "deals" produced immaterial revenues and, contrary to Spatz's express representations, had a completely inconsequential impact on SSOL's market capitalization and book value.

- Spatz misrepresented where the revenues were coming from. Spatz stated that SSOL's revenues came from multiple sources. In fact, Citigroup accounted for over ninety-five percent (95%) of the meager $185,000 in revenue earned by SSOL in the first nine (9) months of 2002.

  Spatz had represented to the Plaintiffs and others that Citigroup would pay SSOL at least $18,000,000 to $25,000,000 per year. Citigroup paid SSOL less than one percent (1%) of the amount Spatz had represented! Spatz professed to know all about the Citigroup deal. He knew that he grossly misrepresented the revenue to be paid by Citigroup.

- SSOL never received the promised $23,000,000.00 in bank financing or anywhere near that type of financial commitment. SSOL eventually obtained $1,000,000 in equity from First Albany.

- Citigroup itself never invested in SSOL. Rather, the Plaintiffs later learned that only a small section of the firm obtained some kind of wireless access to a "platform."

  As was finally disclosed in September 2002, this "deal" did not produce "huge" revenues for SSOL, as Spatz had represented. Rather, the contract produced under $180,000 in revenue in nine (9) months.

- Citigroup never initiated coverage on SSOL and never had any intention of ever doing so.

- The institutional "client" (not clients) turned out to be a Morgan Stanley fund, which purchased approximately 250,000 shares of SSOL.[4] No other institutional purchases were made by any of Spatz's other clients.

55.    In mid-July 2000, the price of SSOL began to decline.

56.    On telephone conference calls and personal calls with Spatz between the end of July and October 2000, Borenstein, Stewart and Armenta were advised and comforted by Spatz that "this stock will turnaround, I guarantee you. This is only a temporary thing. This stock is going to fly." "This thing is definitely coming back." "The Company [SSOL] is worth $60.00 a share easily."

---

[4]    At this time, the specific details of the transactions between Citigroup and the Morgan Stanley Special Value Fund are not known to the Plaintiffs.

57. Spatz advised Borenstein, Stewart and Armenta that they, "and your clients," should hold and buy more stock.

58. In early August 2000, when SSOL traded in the range of $40 to $45 per share, the brokers asked directly whether they should sell their positions and cut their losses. Spatz told the brokers to hold all their shares and that "I would" buy more. Spatz queried, "Why would I put my family in this stock [if it were a risk]? I have to protect them as well."

59. Spatz advised that he was "continuing" to put more "family money" in SSOL. Spatz stated that he would be buying even more after "coverage was initiated." Spatz represented that if the Plaintiffs sold their shares of SSOL – "if you get out now" – then "you won't be able to get back in." "The stock will be over $60 again before you know it."

60. Spatz reiterated that SSOL had signed deals with the major investors and that these investments were "done." It was "only a matter of time" before the revenues starting "pouring in."

61. The Plaintiffs believed Citigroup's head institutional salesman.

### Doug Metcalf and Robert Metcalf

62. In the summer of 2000, Doug Metcalf learned that Spatz had represented that following the announcement of a deal with Hewlett-Packard the investors could expect to see a flood of buying and a 2-for-1 stock split to increase supply for such a "thin" stock as SSOL.

63. The Hewlett-Packard "deal" was announced on June 9, 2000. There was some buying.

64. Metcalf waited for the stock split and began having regular telephone conferences with Spatz. Spatz advised Metcalf that he would see coverage of SSOL by Citigroup "soon." Spatz

expressly represented that coverage by Smith Barney was a definite: it was just a function of time. Coverage was not an "if," but rather a sure thing.

65.     Spatz stated that Citigroup was going to be using SSOL's platform firm wide. Spatz confirmed that the deal with Citigroup alone would make SSOL enough money to cover its overhead. Spatz termed the Citigroup deal a "company maker."

66.     Robert Metcalf participated in about three (3) telephone conferences with Spatz and heard the same representations by Spatz as his son heard. During one conference, Robert Metcalf specifically asked Spatz about Eastman Kodak. Robert Metcalf owned some Eastman Kodak stock. Spatz advised Robert Metcalf to sell Eastman Kodak and buy SSOL. Spatz also advised Robert Metcalf to short Eastman Kodak. Based upon Spatz's advice, Robert Metcalf believed that selling Eastman Kodak and buying SSOL was a positive move based on the risk and reward.

67.     Had it not been for the frequent input and representations from Spatz, Douglas Metcalf would not have held onto his substantial holdings, either for himself, his wife, or his three (3) children in custodial accounts. Metcalf purchased over $1,100,000 in SSOL at prices from $65.00 to $7.00 per share based upon Spatz's representations and omissions. But for Spatz, Robert Metcalf never would have purchased SSOL.

68.     In the summer of 2000, Spatz also specifically informed Borenstein, Stewart and Armenta that Citigroup had done "incredible" due diligence on SSOL and "this is **THE** company." Spatz consistently compared SSOL to several larger companies, such as "Aether Systems" ("AETH") and "Openwave Systems" ("OPWV"), and advised that SSOL "will have at least those market capitalizations" and "value." "Just look at the market capitalization of Aether and Openwave." According to Spatz, that analysis justified a price range for SSOL well "north of

$70.00" per share. Because SSOL had a "superior product," Spatz reiterated confidence in a figure "north" of $300.

69.     Between July and October 2000, AETH was trading in the range of $185 (in July) to $112 (in late October). In November 2000, AETH was still trading above $100 per share.

70.     Between July and October 2000, OPWV was trading in the range of $107 (in July) to $115 (in late October). In November 2000, OPWV was still trading for over $90 per share.

71.     Spatz indicated during a conference call with Borenstein and Stewart that he had or had also seen a "Citigroup research report" that justified his $300+/share price target for SSOL. No such report ever existed. The Citigroup "Equity Research" Spatz did eventually receive totally contradicted his representations.

72.     Other representations originating with Spatz and continuing during this time period included:

- Research coverage was coming.

- SSOL was a $350-500 stock, "minimum."

- Spatz had institutions he was introducing to SSOL.

- SSOL's technology was "superior" to competitors.

- Last, but not least: Spatz was personally buying the stock for his family, kids, and clients.

Spatz was always extremely bullish. Spatz advised that it was safe to buy more SSOL.

73.     As a direct result of Spatz's representations, Borenstein and Stewart began adding to their positions and recommending to the Plaintiffs that they purchase SSOL in the $30-50 range.

Borenstein and Stewart purchased additional SSOL warrants for the Illinois Plaintiffs and the Oklahoma Plaintiffs in the high teens-low $20s.

74.     Stewart wanted to speak with Spatz, but Spatz was vacationing in the Hamptons and was scheduled to go on business with SSOL. At the suggestion of Weber, Stewart called Steven B. Rosner, a consultant for SSOL ("Rosner"), to confirm information that Weber had received from Spatz.

75.     Rosner confirmed the information and told Stewart that Spatz was a large "player" in SSOL and was personal friends with Cassetta.

76.     Rosner also advised Stewart that "Spatz says he will single-handedly take SSOL to $100 with his institutional buying." These comments solidified Stewart's belief in the truth of what Spatz was saying about SSOL.

77.     In September 2000, Weber indicated to Borenstein and Stewart that Spatz had confirmed that Citigroup was now a "BIG" investor in the stock.

78.     Between September 2000 and October 2000, the share price of SSOL dropped. Borenstein and Stewart again contacted Spatz for an explanation and guidance. During the conference call, Spatz stated that he was "100% sure of the contract" between Citigroup and SSOL because he knew about Citigroup's "wireless initiative utilizing SSOL's platform." Spatz stated to Weber and Stewart that, as a result of the Citigroup contract and the other deals, SSOL was going to "OWN the wireless space" and that the stock was "going to fly." Specific revenue figures were discussed.

79.     Between October and December 2000, Spatz advised the Plaintiffs that SSOL was now most certainly "undervalued." Spatz stated that it was a "great time to buy." Through fraud and misrepresentation, Spatz induced the Plaintiffs to buy more stock.

80.     Spatz emphasized that his institutions already had a "toe in position" in SSOL, and were looking to increase their positions. Spatz stated that the institutions "don't buy low priced stocks in the $6-7 range, but will come in at the $10-15 range. Spatz represented that when the stock reached that "certain point" – "about $10.00 a share" – he was going to be bringing in the "institutional clients." Spatz stated directly that at that point the stock would get a "big pop." Spatz told Borenstein, Stewart and several others that at $10-15 "we will squeeze the shorts and the stock will be at $30 before you can blink."

81.     Spatz stated that "you can back a truck up and load up on this stock. It's definitely going up"; "you should be 'loading the boat' before SSOL takes off again."

82.     Spatz recommended to Borenstein, Stewart, Armenta, DiGregorio, and Weber that they should purchase more SSOL for clients.

83.     During another impromptu conference call, in which Stewart participated with Armenta, Weber, and Borenstein, Spatz again affirmed and represented that he had been personally buying SSOL and that the stock would "easily" be well over $100 per share once the revenues from the contracts with "Hutchison, Swisscom, Ericsson, Qualcomm and GoAmerica kick in." Spatz stated that research was "imminent" and that his institutional clients, who "loved" SSOL, would be buying even more once the research was out.

84.     Each of these representations was knowingly false. Spatz knew these events were not going to happen and were most certainly not of the magnitude to move the stock over $100. The

27

announcement on January 30, 2001 that SSOL had executed an agreement that allowed GoAmerica (NasdaqSC:GOAM) to offer SSOL's MobileMarkets™ one-stop wireless financial application produced no apparent revenues and the stock price actually declined. Spatz had no information and no good faith basis for believing this deal would add value to SSOL. The "deal" with Qualcomm was announced in September 2001 and, contrary to Spatz's representations, was only that SSOL had introduced an "application" that "SmartServ _will_ offer to wireless carriers and financial enterprises written to run on QUALCOMM's Binary Runtime Environment for Wireless(TM) (BREW(TM)) platform. MobileMarkets(TM) Silver _will_ allow carriers and subscribers to receive quotes." Upon information and belief, no actual revenues were received by SSOL from Qualcomm.

### The "Equity Research"

85.     In or about January 18, 2001, Spatz received a document entitled, "Salomon Smith Barney 'Equity Research' – Communications Software: M-Powering Wireless Network Convergence." The document was prepared by John H. Hill of Citigroup ("Hill") and was an overview of the "Communications Software" group of stocks. The document mentioned SSOL as one of many "carrier class" companies, but SSOL was not even considered a "Relevant" member of this group. While SSOL's larger competitors, such as OPWV and AETH, were all over the "Communications Software Company Landscape," "Smartserve [sic]" was barely mentioned and was even misspelled by Hill. "Smartserv" was definitely **not** one of the "winners" who Citigroup believed would "own" the mobile user.

86.     Spatz bragged repeatedly that SSOL and its products were vastly superior than those of its competitors. Citigroup's own "Equity Research" demonstrated that these representations were knowingly false.

28

87. "Equity Research" recommended OPWV, AETH, Nuance and Speechworks, but **not** SSOL. While Spatz represented that SSOL was the best product, Citigroup's "Equity Research" concluded that OPWV was "better than any other." Spatz concealed the results of Citigroup's "Equity Research" from the Plaintiffs and misrepresented Citigroup's evaluation of SSOL and its relative importance to its peers.

88. The Plaintiffs waited for the promised contracts and partnerships to be announced and realized. In March 2001, Spatz advised that "big news" was forthcoming from Asia. Spatz went through the millions of subscribers using wireless overseas, multiplied the number of "looks" by $.03-.05 "at the very least," and concluded that the revenues SSOL was going to earn off the Asian contracts with Hutchison Wampoa were "unbelievable!." Spatz spoke of millions of dollars in revenues.

89. Spatz advised Borenstein, Stewart and Armenta to "buy more" for their clients at this level ($6-7 range) and "be patient." Again Spatz emphasized that SSOL was taking business away from competitors, including SVNX. Spatz expressly represented that his institutions were going to increase their positions once the new contracts were announced. Each of these representations was false at the time they were made. Spatz "clients," if indeed any of his clients had positions in SSOL as of March 2001, had no present intention of increasing their holdings, and Spatz knew that.

90. Upon information and belief, Spatz had no indication that any institution intended to increase its equity investment in SSOL.

91. The Plaintiffs followed Spatz's advice. SSOL traded sideways for many months. In October 2001, Spatz emphasized that the "deal" between Citigroup and SSOL was "real" and that

Cassetta was even more excited about SSOL's new business prospects with Qualcomm's iBREW technology.

92.     Spatz bluntly stated that, as soon as the news of the deals was out, he looked forward to "toasting these short mutherfuckers that are leaning on the stock."

93.     Spatz also revealed that one of his institutional clients, a mutual fund managed by Morgan Stanley fund manager, Jenny Beth Jones ("Jones"), had just purchased over 250,000 shares of SSOL. Based upon these comments, certain Plaintiffs placed orders for more SSOL.

## Sherwin Ray

94.     Sherwin Ray purchased a substantial amount of SSOL between 2000 and 2002. Borenstein initially told him about the stock. Borenstein told Ray that he obtained his information from a Citigroup institutional broker named "John Spatz." Ray purchased shares based upon the recommendation of the Citigroup institutional trader. In or about mid-August 2000, Ray was thinking of selling his holdings. Borenstein spoke with Spatz about the matter. The stock had fallen to approximately $32 per share. Spatz advised Borenstein to tell Ray to hold and add to his position. Spatz represented that the stock was "going to $300." Ray followed Spatz advice and held. After August 2000, Ray substantially increased his holdings based upon Spatz's express representations.

95.     Ray participated in a telephone conference with Spatz in late October 2000. The call took place after the announcement on October 11, 2000 concerning the Microsoft Exchange Conference. The price of SSOL had dropped from $29-30 per share down to the mid $14's, all in about ten (10) trading days. The price then went from $14.31 to $19.00 on one day – Friday, October 27, 2000.

96.     During the conference call (with Borenstein on the line), Ray asked Spatz about the jump from $14 to $19 on substantially increased volume. Spatz said that *he* had "cleaned up" the stock and that *that* was just a "sample" of what he could do. Ray asked Spatz why, if he had all this institutional buying to bring in, why not do it now and squeeze the shorts out once and for all, as he had been claiming he intended to do?

97.     Spatz's answer was that he really could not be recommending the stock to anyone yet because the Citigroup "deal" was not yet "inked." "But," he added, he had a friend who was a "fund manager from Morgan Stanley." They "sort of help each other." Spatz stated that he wanted to "get her in on the ground floor." Spatz said he could "trust her." Once the Citigroup deal was signed, Spatz represented that Morgan Stanley and his other institutional clients would be taking "major positions" in SSOL and that Citigroup would be initiating coverage on the stock.

98.     Spatz knew that Sherwin Ray was a major shareholder of SSOL.

99.     Ray asked Spatz whether he should continue hold onto SSOL, or sell now and cut his losses. The stock was trading at $19 per share.

100.     Spatz specifically advised Ray not to sell his stock because Ray had a large position. The "institutions" would be coming to Ray for "size."

101.     Spatz expressly represented to Ray and Borenstein that once the stock was at $30 per share "again," Spatz would "set up" the ability (if they wanted) to unload a "large portion" of our shares in a prearranged fashion, so as not to affect the stock price. Spatz recommended to Ray and Borenstein that they hold their shares and, after selling some at $30, "wait to sell the rest at $50" per share.

102.     These representations, coming from such large institutional broker at Citigroup, who also considered himself an "expert" (Spatz's words) in this field and certainly an "expert" on SSOL, gave Ray the confidence to continue with SSOL after October 2000, often times single-handedly.

103.     As a retail investor, Spatz knew that Ray was propping up a normally thinly traded security by buying more and more (on Spatz's express recommendations) and continuing to cover his margins. Spatz knew that Ray could and would do so. Spatz knew that Ray was one of Borenstein's biggest clients.

104.     After November 2000 and continuing through 2001, Sherwin Ray significantly increased his position in SSOL based upon Spatz's representations and assurances. Shares of SSOL were also purchased in Ray's wife and children's accounts.

105.     In the spring of 2001, Ray met personally with Spatz for lunch at Mi Tsu Yun restaurant in Chicago. Borenstein was also there. SSOL was trading around $7-8 per share. Ray wanted advice as to what to do.

106.     During the lunch, Spatz advised Ray and Borenstein that it was time to "back up the truck." Spatz confirmed and represented that the deal between Citigroup and SSOL was "done." It was just waiting to be signed by "one more guy," and then it would be announced. Spatz stated that "for now," it was just the institutional brokers who had the Blackberry device, but Citigroup definitely intended to use SSOL firm wide. Spatz said that SSOL was already in negotiations with Citigroup's other divisions and with Deutsche Bank, Morgan Stanley, Merrill Lynch, and Goldman Sachs.

107.     These representations were knowingly and/or recklessly false. SSOL was never in negotiations with either Merrill Lynch or, upon information and belief, Goldman Sachs. The head

options trader at Deutsche Bank, Brian Kiliffer ("Kiliffer"), has confirmed that Deutsche Bank never had any interest in SSOL, nor was Deutsche Bank ever contacted by anyone to participate in any financing for SSOL.

108. Spatz showed Ray his Blackberry device and how it worked. The device could not operate, however, as the cellular reception in the restaurant was weak. Spatz emphasized that "Aether has nothing." He said he knew for a fact that "SmartServ will be used by every brokerage firm." There was no basis for Spatz's prediction.

109. At the meeting in Chicago, Spatz next discussed the purchases of SSOL being made by his institutional "clients." Spatz stated that "Jenny" from Morgan Stanley was buying for a "toe in position" to the tune of approximately 250,000 shares. In addition to Morgan Stanley, Spatz emphasized that "other institutional friends" were also "buying" SSOL.

110. Spatz expressly represented that after the Citigroup deal was announced, Morgan Stanley would be buying "at least 1,000,000 shares." Spatz again stated that Citigroup intended to cover the stock and "recommended it."

111. These representations were knowingly and/or recklessly false. Spatz had no basis for believing that Morgan Stanley intended to buy "at least 1,000,000 shares" of SSOL. Spatz knew that Citigroup did not recommend SSOL to its clients and never intended to cover the stock. Upon information and belief, SSOL never appeared as a "pick" or recommended buy in any Citigroup newsletter or report.

112. As a direct result of Spatz's representations, Ray decided to hold his position in SSOL and not to sell. Spatz was talking about substantial institutional support. Ray continued to buy and support the stock.

113.     As of the fall of 2001, Ray and his family owned over 370,000 shares of SSOL. Spatz knew that if Ray sold his shares, the stock price would drop precipitously.

114.     After 9/11, Sebastian Cassetta, the CEO of SSOL ("Cassetta"), also called Ray and said that he was calling the "major shareholders" and trying to drum up support for the stock. Like his good friend, John Spatz, Cassetta was also making sure that the Plaintiffs were not going to sell.

### The Citigroup Deal

115.     During 2001, Spatz continued to represent that the Citigroup deal was "done" and would be announced imminently. Spatz offered a series of plausible reasons why the announcement was "momentarily" held up: in March, someone wasn't in the office to sign the document; in June, "Pikowski" was not there; then someone in legal was "fired."

116.     The Citigroup deal was finally announced on December 3, 2001. The press release did not even identify Citigroup by name. Instead, it referred to a "leading global, full-service investment banking and securities brokerage firm." The "brokerage firm" was Citigroup, however.

117.     The press release represented that all of Citigroup's "12,000 financial consultants located in some 500 offices" with "more than 7 million client accounts representing $1 trillion in client assets" were going to use SSOL's product. Spatz further represented to Ray that all "five divisions, including the insurance division of the firm," were going to use SSOL's product.

118.     Ray would later find out that only a small part of Citigroup's "equity department staff" was given access to SSOL's platform.

119.     The December 3, 2001 press release further stated that the "specific terms of the agreement were not disclosed," but "Smartserv will generate revenues from monthly subscription fees."

120.     Spatz had represented that the fees from the Citigroup deal alone would generate "at least" $18,000,000.00 to $25,000,000.00 per year. Spatz represented that the Citigroup deal "alone" would turn the company profitable. Upon information and belief, Spatz had seen the master product license services agreement between Citigroup and SSOL and he knew of the limited interest in SSOL. Spatz knew that his statements concerning the expected revenue from the Citigroup deal were false.

121.     Spatz knew and concealed the fact that 95.1% of SSOL's revenues were generated through its licensing arrangement with Citigroup. Spatz led Ray and the other Plaintiffs to believe that SSOL had substantial revenues from multiple sources, including Hutchison Wampoa, IBM, and Verizon.

122.     In particular, Spatz advised Borenstein, Weber and clients of Weber (Citigroup customers) that within six (6) months of Verizon coming online, Verizon would have between 1.5 and 2 million customers signed up to use SSOL's product. Verizon would pay SSOL a monthly subscription fee of at least $3.00 per customer for the service. According to Spatz, revenue from Verizon "conservatively" would exceed $54,000,000 per year.

123.     Spatz knew or should have known that his representations concerning Verizon and the others were false. Spatz had no information that would have supported his statements. His revenue model was completely fabricated. In the first nine (9) months of 2002, SSOL received less than $7,200 in revenue from sources other than Citigroup. Verizon came "online" on July 11, 2002. Within the first six (6) months of Verizon coming online, SSOL received a grand total of $9,595.04 from sources other than Citigroup. Even if all this revenue came from Verizon, which, upon

information and belief, it did not, Spatz would still have grossly misrepresented the Verizon deal. Spatz lied about the quantity and quality of SSOL's revenues.

124.    Spatz told Ray that once the Citigroup deal was announced, all the major brokerages would have to use SSOL to keep pace with Citigroup. Upon information and belief, no other brokerage firm has ever used SSOL's product. Merrill Lynch denies having any contact with SSOL.

125.    Spatz further said that the "IBM announcement" would cause the stock to "pop" "just like it did with SVNX." Spatz informed Ray that when SVNX announced a deal with IBM, its stock tripled overnight.

126.    There has never been any "IBM announcement" to date. It is not known whether SSOL has had any contact with IBM.

## Additional Revenue Misrepresentations

127.    In December 2001, during a ski trip or vacation in Switzerland, Spatz presented additional revenue numbers on SSOL. Spatz indicated he had spoken with an analyst in San Francisco. "They" were going to get coverage on SSOL. Spatz stated that the "worst case scenario" was that SSOL received $6,000,000 from the Asian contracts and $36,000,000 from iBREW (Qualcomm), putting earnings at between $1.00-1.25 per share, at the least.

128.    These representations were false at the time they were made and Spatz had no reason to believe they were true.

129.    Following 9/11, Doug Metcalf, a venture capitalist from Massachusetts, spoke to Spatz more frequently, as he was concerned about SSOL's cash position. At all times, Spatz assured Metcalf it was "absolutely not a problem." Spatz told Metcalf he knew where the money was coming from, and it would be a "non-issue."

130. As with Borenstein, Stewart and Armenta, Spatz told Metcalf that he was actually going to "buy more" SSOL for himself, but that he had to clear it with "the wife." Spatz lamented many times that, if his wife wasn't overseeing his purchases, he would be buying substantially more stock than he already had under his "control."

131. Unbeknownst the Plaintiffs, Spatz purchased shares of SSOL in brokerage accounts belonging to others and loaned money to others to purchase stock, making it appear that there was more interest in SSOL than there was.

132. Spatz represented to Metcalf that SSOL had the best revenue model of all the wireless players and was the answer for many telecom companies. Spatz recklessly and baselessly stated that revenue for the year 2001 would be in excess of $15,000,000.00, "with ease," based on the relationships already concluded.

133. When SSOL filed its Form 10K, gross revenue for 2001 was reported to be only $3,297,806 and net loss was reported to be ($14,819,860.00).

134. In January 2002, the Plaintiffs were informed that Qualcomm had "delayed 3G rollout" until the spring, but it was still coming and was "huge" for SSOL.

135. In April, 2002, Spatz emphasized that there were funds and strategic investors chomping at the bit to give SSOL money and be part of the company's future: names like "Quantum Fund, Invescorp, Barclays, Motorola, Qualcomm, and the Forbes Special Situation Fund." Together with the venture capital fund of Citigroup, these entities were "ready" to invest between $12,000,000.00-$15,000,000.00 in SSOL.

136. Combined with certain private investors who were willing to put up even more money, Spatz represented that "SSOL will never need money again."

137.    The stock bounced between $5 and $6 per share. The Plaintiffs continued to hold. They did not sell because they had already experienced significant losses and because they continued to believe Citigroup's top institutional analyst and follow his recommendation to hold the stock.

138.    **None** of the big investors, including Citigroup or Qualcomm, ever materialized. The $12-15 Million in "ready" capital was never received. A company called First Albany, with whom Spatz had undisclosed connections, agreed to invest $1 million in SSOL. First Albany actually brought in hedge funds to invest in SSOL. That was it.

139.    On August 15, 2002, SSOL reported revenues for the six (6) months ended June 30, 2002 of only $64,636 – grossly different than the revenues Spatz had represented.

### The Morgan Stanley Deception – Conflict of Interest

140.    In mid-May, 2002, volume on SSOL picked up dramatically.

141.    Because of Level II, Borenstein, Stewart, Armenta and the other retail brokers knew that Citigroup was continually on the offer and was selling stock.

142.    Borenstein, Armenta, Stewart, Metcalf, Weber, and DiGregorio each specifically asked Spatz, "Who's selling through Citigroup?"

143.    Spatz expressly and repeatedly represented that it was "just retail orders."

144.    The truth, as the Plaintiffs would later find out, was that Spatz knew Cassetta and another SSOL executive, Robert Pearl ("Pearl"), were selling to meet margin calls and were otherwise liquidating their holdings. Cassetta alone was selling over 244,900 shares of SSOL. Citigroup and Spatz profited from these sales.

38

145.     Armenta and Stewart also specifically asked Spatz whether "Jenny Jones [the Morgan Stanley fund manager]" was still in SSOL? "Is she going to buy more?" Spatz indicated that Jones was starting up a new billion-dollar fund, and that SSOL did not fit her stock profile.

146.     Spatz represented that "Jenny" was "definitely NOT selling," "but probably won't buy anymore" for her existing fund.

147.     Borenstein asked Spatz a similar question. Is Jenny selling? Spatz repeated to Borenstein that "Jenny is NOT selling."

148.     Doug Metcalf also called Spatz for some direction on who was selling the stock. Metcalf asked Spatz specifically: Was it an institution he brought in who was selling? Was the seller an insider who got margined out of a position? Spatz told Metcalf point blank that "none" of his "contacts" or institutions was selling the stock. He suggested a "short theory": that it was people who knew a funding was going to be done, so they sold the stock short in advance of the placement.

149.     Plaintiffs held their positions in reliance upon the fact that Morgan Stanley was not selling.

150.     The stock dropped to $1.00 per share before they learned the truth.

151.     The truth was that Morgan Stanley was actually unloading over 250,000 shares into the open market.

152.     Spatz knew that Morgan Stanley was selling. At least some of the sales were made through Citigroup.

153.     Ray, Metcalf, Borenstein, Stewart, Armenta, Weber, DiGregorio and many others were floored when they learned that Morgan Stanley was actually selling at a time when Spatz told

the Plaintiffs to buy more and hold. Borenstein was devastated. He had trusted Spatz implicitly. Spatz knew that Borenstein had recommended to Ray that he hold his position.

154.    Citigroup and Spatz concealed from the Plaintiffs the fact that Morgan Stanley was selling SSOL. Upon information and belief, Citigroup concealed the fact that Morgan Stanley was selling because Citigroup and Morgan Stanley do substantial investment banking with one another. Rather than act in the best interests of the Plaintiffs, Citigroup acted solely to bolster its relationship with Morgan Stanley.

155.    Plaintiffs have now suffered a total loss of their retirement money and investments. The SSOL warrants are worthless. The stock is now worth less than $0.75 per share.

## COUNT I – SECURITIES FRAUD

156.    Plaintiffs restate paragraphs 1 through 155 of their Complaint, and incorporate them herein by reference.

157.    As specifically alleged above, Citigroup and Spatz made numerous misrepresentations of material fact to the Plaintiffs between January 2000 and June 2002. Citigroup and Spatz misrepresented the nature and timing of the "deals" that would "launch the stock"; misrepresented the quantity and quality of SSOL's revenues; misrepresented bank/capital financing for SSOL; outright lied and/or materially misled the Plaintiffs about the nature and extent of Citigroup's investment in SSOL and concealed the true relationship between Citigroup and SSOL; knowingly misrepresented that Citigroup intended to initiate coverage on SSOL; and recklessly advised Plaintiffs to hold and buy more SSOL.

158. Worse than the misrepresentations, Spatz told the Plaintiffs to "hold" and "buy more" at a time when Spatz knew that Morgan Stanley was selling. Spatz expressly and affirmatively told the Plaintiffs that Morgan Stanley was "NOT selling."

159. Spatz further misrepresented that the sales were only "retail sales." Spatz and Citigroup knew that Cassetta and Pearl were selling massive amounts of stock because Cassetta and Pearl were being sold out on margin by Citigroup! Spatz totally concealed the nature and scope of his various conflicts of interest.

160. Spatz materially misled the Plaintiffs about the involvement of his institutional "clients" in SSOL. Spatz lied about "buying more" SSOL for himself and his family. Upon information and belief, Spatz lied about putting all his "father's retirement money" in SSOL.

161. Citigroup and Spatz advised Plaintiffs to hold onto SSOL and not sell their shares based on the false representation that SSOL had some "unique" or "superior" technology that AETH, OPWV, and SVNX did not have, and that SSOL would "capture" the market and obtain a market capitalization and book value greater than that of AETH and OPWV. Spatz knew about the "Equity Research" and concealed it from the Plaintiffs.

162. At all material times, Citigroup and Spatz had superior knowledge concerning SSOL, Morgan Stanley, **and** Citigroup. Citigroup and Spatz knew that the Plaintiffs and other investors were acting on the assumption that the "deals" were "done," that the forthcoming revenues would be substantial ("huge") – significant enough to materially affect the market capitalization and book value of SSOL – and the certain expectation that SSOL would rise in price to the level of its lesser counterparts, AETH and OPWV.

41

163. Citigroup and Spatz knew that the Plaintiffs were purchasing shares of SSOL, holding their shares and buying more. Citigroup and Spatz knew that the Plaintiffs were acting on the assumption that **none** of Spatz's institutional "clients" was selling SSOL.

164. Citigroup and Spatz knew that their misrepresentations and omissions were materially false and misleading. Spatz knew that Citigroup did not intend to make a firm wide investment in SSOL. Spatz knew that Citigroup did not intend to initiate coverage on the stock. However, Spatz and Citigroup **_did_** know that these representations would be important to investors like the Plaintiffs.

165. Citigroup and Spatz's statements were not made in good faith and were not genuinely believed at the time they were made. Citigroup and Spatz did not have a reasonable basis for any belief that what they were saying was true, and they were aware of undisclosed facts, such as the Equity Research, tending to seriously undermine the accuracy of their beliefs. Citigroup and Spatz knowingly said things that were completely discordant with reality.

166. Citigroup and Spatz's misrepresentations proximately caused the Plaintiffs' losses. But for the misrepresentations and omissions, the Plaintiffs would never have invested in SSOL in the first place. Had it not been for Citigroup and Spatz's continuing misrepresentations, Plaintiffs would have sold their initial holdings of SSOL and would most certainly not have purchased any more SSOL. The so-called "bubble" burst in March 2000. The stock market was not the safest place to keep money between July and December 2000. Nonetheless, the Plaintiffs relied on Spatz's representations and omissions in deciding to keep their money in the stock market, especially in SSOL.

167. Plaintiffs' purchases of stock and Plaintiffs' retention of their stock propped up the price of SSOL even in a declining stock market. Plaintiffs' support of SSOL allowed Spatz to bring

in business to Citigroup and close deals with his institutional clients. Upon information and belief, Spatz received bonuses and other compensation from Citigroup and SSOL for promoting the stock and bringing in business. If the Plaintiffs had sold their positions at any time between May 2000 and May 2002, the price of SSOL would have fallen precipitously. Spatz convinced the Plaintiffs to hold and buy more thereby artificially inflated the price of SSOL.

168.    The artificially inflated stock price also facilitated SSOL in doing business with its customers. SSOL was able to close deals because it was able to argue that there was substantial support for its product and future as an ongoing concern.

169.    Had the Plaintiffs known what Citigroup and Spatz knew about the various "deals," including Citigroup's true intentions about investing in SSOL and the lack of revenues from the various "alliances," Plaintiffs would have sold their shares at $50.00 and cut their losses. Plaintiffs would not have purchased more of the stock.

170.    In the period from May 2000 through May 2002, the Plaintiffs purchased and held onto stock that they were repeatedly assured would substantially increase in value. Plaintiffs' lost all their money because they trusted and relied upon Citigroup and Spatz's misrepresentations and omissions.

171.    No reasonable investor would have found Citigroup and Spatz's misstatements, omissions and investment advice concerning SSOL to be insignificant.

172.    Plaintiffs justifiably relied upon Citigroup and Spatz's representations, omissions and supposed expertise. Plaintiffs believed that if SSOL had all those suitors, like Microsoft, Verizon, Qualcomm – indeed Citigroup – that it must be a sound investment. Plaintiffs believed that if Citigroup itself – a proclaimed "leader in the U.S. securities industry" – had committed to SSOL that

the Company must certainly be an excellent prospect. Plaintiffs believed that if Morgan Stanley was "NOT selling," they should hold too. This is why the Plaintiffs purchased and held their retirement money in SSOL.

173. Citigroup and Spatz's misrepresentations and omissions were done knowingly, recklessly and with the intent to mislead. Citigroup and Spatz acted with reckless disregard for the rights and interests of Plaintiffs and other investors.

174. Plaintiffs believed Citigroup and Spatz's representations, relied and acted upon the representations and omissions, purchased and held securities based upon the misrepresentations and omissions.

175. Citigroup and Spatz's actions violate § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder. Citigroup and Spatz misrepresentations and omissions also constitute common-law fraud. Citigroup and Spatz made numerous false misrepresentations of material facts, knowingly and intentionally and with the intent to mislead. Plaintiffs relied upon these misrepresentations and omissions and, as a direct and proximate result, lost their entire investments. Citigroup and Spatz represented as true what was really false in such a way as to induce any reasonable person to believe it, and with the intent that the Plaintiffs and other investors would act upon the misrepresentations and omissions.

176. As a direct result of Citigroup and Spatz's fraud, misconduct, actions and inaction, the Plaintiffs have suffered damage and incurred loss, including, but not limited to, direct loss of the value of their investments, lost investment opportunities, loss of business, loss of life savings and retirement, costs, expenses, attorney's fees and other out-of-pocket expenses.

## COUNT II - CONTROL PERSON LIABILITY

177.    Plaintiffs restate paragraphs 1 through 176 of their Complaint, and incorporate them herein by reference.

178.    As detailed above, Citigroup (f/k/a Salomon Smith Barney) and Spatz made numerous false statements and omissions of material fact with scienter upon which the Plaintiffs justifiably relied that proximately caused the Plaintiffs' damages.  Citigroup and Spatz violated § 10(b) of the Exchange Act and Rule 10b-5.

179.    Defendant, Citigroup, Inc., actually controlled the general operations of Salomon Smith Barney (referred to in this Count II as "SSB") and SSB controlled the actions of Spatz.  At all material times, Citigroup, Inc. possessed the power to direct or cause the direction of the management and policies of SSB, through its stock ownership of SSB, its control of the SSB board of directors, and its influence over the SSB planning group.  Citigroup, Inc. directly controlled and influenced the specific corporate, compliance and supervisory policies and conduct, which resulted in SSB and Spatz's violations of the securities laws.  Citigroup, Inc. did nothing to separate institutional and retail brokers, allowing Spatz to manipulate DiGregorio, Weber, Menacho and others, and to defraud retail investors to support SSB's institutional business.  Citigroup, Inc. and SSB had the opportunity to prevent Spatz from meeting with retail investors, like Sherwin Ray, and soliciting stock purchases from non-clients of Citigroup, but they did nothing to stop this practice. Spatz preyed upon retail brokers across the country and used retail clients to artificially inflate the price of SSOL.  Citigroup, Inc., directly or indirectly through dividends from the operating revenues of SSB, received the ill-gotten gains of Spatz's fraud upon the Plaintiffs.

180.    Both Citigroup, Inc. and SSB directly or indirectly induced the acts constituting the violation or cause of action in this case.

181.    Citigroup, Inc. knew or should have known that Spatz went totally unsupervised by SSB and that SSB failed to enforce any supervisor system in place. Citigroup, Inc. knew or should have known about Spatz's misrepresentations and misconduct. Spatz was SSB's top institutional salesman. Spatz represented that he put all his family's money in SSOL and was buying for his own account. These matters should have been reported and approved by the compliance department at SSB. SSB knew that Spatz was not complying with SSB policy. SSB allowed the misconduct, including Spatz's trading away from the firm, to continue. Spatz represented to DiGregorio that the CEO of Citigroup, Inc., Sanford Weill, sold all of his SVNX when he (Weill) learned that SSOL was the "superior" company. As a result of Spatz's misrepresentations, SSB retail customers were buying massive amounts of SSOL, again with no oversight or review. Citigroup, Inc. and SSN employed a 'look the other way' policy when it came to institutional brokers.

182.    Citigroup's actions and omissions violate § 20(a) of the Securities Exchange Act of 1934. 15 U.S.C. § 78t.

183.    As a direct result of Citigroup, Inc.'s misconduct, actions and inaction, Plaintiffs have suffered damage and incurred loss, including, but not limited to, direct loss of the value of their investments, lost investment opportunities, loss of business, loss of life savings and retirement, costs, expenses, attorney's fees and other out-of-pocket expenses.

## COUNT III -CONSPIRACY

184.     Plaintiffs restate paragraphs 1 through 183 of their Complaint, and incorporate them herein by reference.

185.     Citigroup and Spatz combined, associated, agreed or acted in concert with SSOL, Morgan Stanley, and other third parties for the purpose of willfully and maliciously defrauding the Plaintiffs and injuring the Plaintiffs in their businesses and investments.  As part of a concerted scheme to artificially inflate the price of SSOL, Spatz totally fabricated information about impending "deals" and recklessly agreed to convey this information to the Plaintiffs on behalf of SSOL, Citigroup, and/or other third parties.  Spatz misrepresented the nature of Citigroup's investment in SSOL and Citigroup's initiating coverage on SSOL in order to artificially inflate the price of the stock and obtain more business for Citigroup and SSOL, more equity, and more public support from investors like the Plaintiffs.  In combination with SSOL, Citigroup and Spatz concealed the fact that Cassetta and other SSOL executives were selling to meet margin or take profits.  In concert and combination with Morgan Stanley, Citigroup and Spatz concealed the fact that Morgan Stanley was also selling SSOL.

186.     Citigroup and Spatz's wrongdoing generated profits for Spatz, his "friends" and "institutional clients," and produced further losses for the Plaintiffs.  Citigroup and Spatz materially aided and abetted the "shorts" Spatz repeatedly claimed he was going to "squeeze."

187.     At all material times in 2000 and 2002, Citigroup and Spatz knew that if the truth was revealed to the Plaintiffs – *e.g.*, that the "deals" were not imminent, that Citigroup was **not** investing in SSOL and was **not** initiating coverage on the stock, and that Morgan Stanley **was** selling – the

Plaintiffs would most certainly have sold their holdings at each of these points, and realized the losses then.

188.    Citigroup and Spatz knew that the Plaintiffs owned enough stock such that a sale by the Plaintiffs at $50 per share or even $10 per share would have driven the stock price substantially lower. By lying to the Plaintiffs, Citigroup and SSOL avoided a precipitous drop in the stock price. By generating substantial retail support for SSOL, Citigroup, Spatz and SSOL were able to convince Morgan Stanley to buy 250,000 shares of SSOL. Citigroup and Spatz were subsequently to protect Morgan Stanley (and Spatz's friend "Jenny") and allow its fellow investment banker to exit the position without suffering the kind of loss the Plaintiffs suffered. Upon information and belief, Citigroup and Spatz received commissions and profits from the sale of SSOL to Morgan Stanley.

189.    Citigroup and Spatz knowingly and voluntarily participated in a common scheme to commit fraud upon the Plaintiffs. Citigroup and Spatz acted intentionally, purposefully and without lawful justification.

190.    Citigroup and Spatz' actions constitute a civil conspiracy.

191.    As a direct result of the conspiracy, misconduct, actions and inaction, the Plaintiffs have suffered damage and incurred loss, including, but not limited to, direct loss of the value of their investments, lost investment opportunities, loss of business, loss of life savings, costs, expenses, attorney's fees and other out-of-pocket expenses.

## COUNT IV –NEGLIGENT MISREPRESENTATION

192.    Plaintiffs restate paragraphs 1 through 191 of their Complaint, and incorporate them herein by reference.

48

financial statements, Defendant, Citigroup, Inc.'s total assets exceed $1.1 Trillion, including assets belonging to Citigroup (Salomon) of $197,117,000,000.00. Citigroup, Inc.'s gross yearly revenues exceed $92 Billion Dollars. Net income exceeds $15.275 Billion. Given the nature and enormity of the wrong and the financial status of the Defendants, Plaintiffs seek an award of punitive damages that will send a message to Citigroup, Salomon and its institutional trader that it is illegal, unethical and unfair to prey upon the retail investing public. Plaintiffs seek to stop Citigroup from ever defrauding another investor again.

WHEREFORE, Plaintiffs respectfully request the Court to enter Judgment against Defendants, Citigroup Capital Markets, Inc. and John Henry Spatz, jointly and severally, as follows:

A.  Compensatory damages in an amount not less than $24,500,000;

B.  Punitive damages in the amount of $100,000,000;

C.  Prejudgment interest;

D.  Post-judgment interest;

E.  Attorney's fees, expert witness fees, and all other costs and expenses incurred by the Plaintiffs in this action; and

F.  Such further relief as is just and proper.

IN ACCORDANCE WITH RULE 38, TRIAL BY JURY IS HEREBY DEMANDED.

> SHERWIN I. RAY
> CAREPLUS MANAGEMENT, INC.
> CHICAGO CHESED FUND
> AGUDAUTH ISRAEL OF ILLINOIS
> ALFRED AGHAIEPOUR,
> JAKOB BAKST, GERSHON BASSMAN
> LAWRENCE BORENSTEIN
> SHARI BORENSTEIN
> BERNARD COHEN, LOIS COHEN
> MARC COHEN

52

FARSH DAVATGAZADEH
WILLIAM R. DUNAVANT
LEE FRIEDMAN, FELICE FRAND
ARI FRIEDMAN
YOSEF DAVIS, DANIEL GOOZE
ROBERT GLUCK, YISROEL GLUCK
ABRAHAM HARTMAN
TOVA HARTMAN
BERNARD HOLLANDER
NACHAMAH JACOBVITS,
ROSEMARY KAYNE
SANFORD KAYNE
SHARAM KOHANANOO
JOSEPH KNOPF, ALAN M. KNOPF
MICHAEL KNOPF, HILDA LOEW
YECHIEL LANDAU
HERSCHEL LICHTMAN
ISRAEL LICHTSHEIN
NAVA LICHTSHEIN
LINCOLN AVE SHOES INC.
BARBARA MADNICK
MARGOLIES CLINIC
HENRY MERMELSTEIN
JOSEPH MERMESTEIN
MARVIN MERMELSTEIN
GEORGE OFMAN, DOV PEIKES
CHAIM RAJCHENBACH
MOSHE RAJCHENBACH
JACK RAJCHENBACH
NAOMI RAJCHENBACH
RAJCHENBACH TRUST
BARRY RAY, HELEN RAY
JOSHUA RAY, SHARON RAY
AMY RAY TRUST, JORDAN RAY
CHAIM RAY, ELIMELECH RAY
MALKA RAY
BERNARD ROSENBERG
DAVID ROSENBERG
JOEY STERN TRUST
YESHIVA TELSHE
TORAH ACADEMY
TORAH ACADEMY ENDOWMENT
TORAH ACADEMY OF MINNESOTA

53

ARYEH WEINBERG
DOUGLAS METCALF
ROBERT METCALF
MARK STEWART, SUSAN STEWART
SANDI STEWART, ANNE STEWART
ANANTHA AGASTHYA
RICHARD ALTDOEFFER
AM. CRYSTALLOGRAPHIC ASSOC.
CAROL A. AYERS, PAUL BARNES
M. WILENE BARNES, JOHN BARTON
STANLEY BIRCH
H.K. BLOCH IRREV. TRUST
B.U. HABIB RETIREMENT PLAN
BOB CRAVENS REVOC. LIV. TRUST
BRIAN D. TIPTON
EASTLAND EYECARE
EASTLAND OPTICAL
GWENDOLYN BRAND
FONDA BROUSSEAU
BEN B. BUCKLAND, TRACY BUGG
DR. K. CHANDRASEKARAN
JAY CLARK
CLEVELAND REVOC. LIV. TRUST
RANDY COCKLIN
BART COOKE, CHARYL COOKE
ANDREW DAVIS, DIANE DAVIS
JUDITH DAVIS, JOANN DRUM
EDMOND PUBLIC SCHOOLS FOUND.
BRAD EFAW COMPUTERS
BRADLEY EFAW, MARY JO EFAW
EVELYN ETTER REVOC. LIV. TRUST
JIMMY FLETCHER, RUTH FOSTER
CHARLES FUNDERBURK
M. GHAZNAVI, MD
J. GHAZNAVI, MD
WILLIAM GLASS, N. JEAN GLASS
VICKI GREEAR, MARY GREEAR
LARRY GRIFFIN, SHARLA GRIFFIN
NORMAN HARTLEY, DORIS HILL
FREDEAN HOOKER, KAREN JONES
ANNAH KING MPP. & TRUST
JERRY KING, J. & S. KINDER
NORAH LUKER, O.R. LUKER

54

O.R./NORAH LUKER REV. LIV TRUST
LOREN MENNEM, LESLIE A. MENNEM
JAMES MCGILL, K.R. MERIWETHER
V. L. MILLER
V.L. MILLER REVOC. LIV. TRUST
RON MITCHELL, MILTON MOONEY
GARY MOORE, RITA MOORE
BRIAN MORGAN, E. MOSER
R. A. MOSLEY, R.J. NALL
CONNIE NALL, JANET NEYER
LEO NEYER, M. N. NICHOLSON
MARLENE PANSZE
M. PANSZE REVOC. LIV. TRUST
GAIL PARK, SAM PARK
C.J. PRICE, S.N. RAO, S. ROHRER
BRANDI ROOT, JESSICA ROOT
WANDA SCHERLER
RICHARD SCHERLER
CHARLES SCHMIDT, GARY SEAL
DEBBIE SEELEY
SEELEY LIVING TRUST
MINNIE SOAPES, A. STEWART
SCOTT STRELLER, GENE STRELLER
MARY STRELLER
CHARLES SULLIVAN
SUSANNE SULLIVAN
DANNY TEACHMAN, CHARLES TEW
JIM TEROW, D. BRENT TIPTON
ARCHARYULU VEDALA
STEVE WALDO, ONETA WARD
D. WHITTINGTON
HILGENBERG REVOC. LIV. TRUST
ANN WILSON, PAULINE WILSON
R/P WILSON REVOC. LIV. TRUST
JAFFREY ZAFAR, CAROLYN GLOVER
PAUL GLOVER, SCOTT JACOBSON
GLOVER INTERN. FOUNDATION
TERI JONES
CHRISTINE NEKEREROFF
ANTHONY W. ARMENTA,
MARGA ARMENTA,
DONALD ASHER, RUDI BIANCHI, JOHN
BONDE, BIG SOLUTIONS, MONEY CIRCLE,

55

SIMON CITTONE, JOHN COSTELLO
LENKA DANOFF
RANDY DREW, STEVEN DREW
MARK DURANTE,
STEVEN HERNANDEZ,
GARBIELLA ITO, MICHAEL KAHN
JAMES HESS, DAVID MAY
LEON IND. INT'L CORP.
JAMES MCFADDEN
THOM MCFADDEN
TYLER MCFADDEN
WILL MCFADDEN
J. DOUIGLAS MCNAIR
BRAD NICOLAISEN
MIA NICOLAISEN
JOHN NICOLAISEN
ARMANDO PEREZ, PRAYAG PRASAD
ANTON PILS
MARK RAUSSEO, SCOTT SHEPPARD
STANLEY K. SHEPPARD
LISA TETEAK
B.J. UKRA, MARK UKRA
ERWIN VOGEL, MICHAEL WIEDDER
JAMIE WILKIE, ROBERT WOOG


By:  *Catherine M. Chapman*
One of the Attorneys for the Plaintiffs

Names and Addresses of Attorneys for the Plaintiffs:

Steven S. Biss (VSB # 32972)
P.O. Box 592
Richmond, VA  23219
Telephone:     (804) 643-2090
Facsimile:      (202) 318-4098

Catherine M. Chapman
Karl E. Masters
Baum Sigman Auerbach
   Neuman & Katsaros, Ltd.
200 W. Adams Street, Suite 2200
Chicago, IL  60606
Telephone:     (312) 236-4316
Facsimile:      (312) 236-0241

56

JS 44
(Rev. 07/86)

## CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I (a) PLAINTIFFS**

Sherwin I. Ray, et al

JUDGE KENNELLY
03C 3157

**DEFENDANTS**

Citigroup Global Markets, Inc.
Citigroup, Inc.
John Henry Spatz

DOCKETED
MAY 13 2003

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF **Cook**
(EXCEPT IN U.S. PLAINTIFF CASES)

MAGISTRATE JUDGE LEVIN

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Baum Sigman Auerbach Neuman & Katsaros
200 W. Adams Street, Suite 2200
Chicago, IL  60606

ATTORNEYS (IF KNOWN)

**II. BASIS OF JURISDICTION** (PLACE AN x IN ONE BOX ONLY)

- ☐ 1 U.S. Government Plaintiff
- ☐ 2 U.S. Government Defendant
- ☒ 3 Federal Question (U.S. Government Not a Party)
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.
DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

This is an action brought under § 10(b) of the Securities Exchange Act and Rule 10b-5 promulgated thereunder. Plaintiffs further allege conspiracy, negligent misrepresentation, and negligent supervision.

**V. NATURE OF SUIT** (PLACE AN x IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury— Med Malpractice | ☐ 620 Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury— Product Liability | ☐ 630 Liquor Laws | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 640 R.R. & Truck | **PROPERTY RIGHTS** | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 650 Airline Regs | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 660 Occupational Safety/Health | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 690 Other | ☐ 840 Trademark | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☒ ☒ 850 Securities/Commodities/ Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 863 DIWC (405(g)) | ☐ 892 Economic Stabilization Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | ☐ 863 DIWW (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | ☐ 530 Habeas Corpus | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 540 Mandamus & Other | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 550 Civil Rights | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | | | | | |

**VI. ORIGIN** (PLACE AN x IN ONE BOX ONLY)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

**VII. REQUESTED IN COMPLAINT:**
CHECK IF THIS IS A **CLASS ACTION**
☐ UNDER F.R.C.P. 23

DEMAND $ 124.5 million

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ YES ☐ NO

**VIII. REMARKS** In response to ☒ is not a refiling of a previously dismissed action
**General Rule 2.21D(2)** this case ☐ is a refiling of case number _____ of Judge _____

DATE
05/12/03

SIGNATURE OF ATTORNEY OF RECORD
Catherine M. Chapman

1-2

**UNITED STATES DISTRICT COURT**

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

JUDGE KENNELLY

MAGISTRATE JUDGE LEVIN

DOCKETED
MAY 13 2003

In the Matter of

Sherwin I. Ray, *et al.*

     v.

Citigroup Global Markets, Inc., *et al.*

03C 3157

Case Number:

APPEARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR

Sherwin I. Ray, *et al.*, Plaintiffs

| (A) | | | (B) | | |
|---|---|---|---|---|---|
| SIGNATURE *Catherine M. Chapman* | | | SIGNATURE | | |
| NAME  Catherine M. Chapman | | | NAME  Karl M. Masters | | |
| FIRM  Baum, Sigman Auerbach, Neuman & Katsaros, Ltd. | | | FIRM  (same as A) | | |
| STREET ADDRESS  200 W. Adams Street, Suite 2200 | | | STREET ADDRESS  (same as A) | | |
| CITY/STATE/ZIP  Chicago, IL  60606 | | | CITY/STATE/ZIP  (same as A) | | |
| TELEPHONE NUMBER  312/236-4316 | FAX NUMBER  312/236-0241 | | TELEPHONE NUMBER  (same as A) | FAX NUMBER  (same as A) | |
| E-MAIL ADDRESS  cchapman@baumsigman.com | | | E-MAIL ADDRESS  kmasters@baumsigman.com | | |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE)  6204026 | | | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE)  6277980 | | |
| MEMBER OF TRIAL BAR?  YES ■  NO ☐ | | | MEMBER OF TRIAL BAR?  YES ☐  NO ■ | | |
| TRIAL ATTORNEY?  YES ■  NO ☐ | | | TRIAL ATTORNEY?  YES ☐  NO ■ | | |
| | | | DESIGNATED AS LOCAL COUNSEL?  YES ☐  NO ☐ | | |
| (C) | | | (D) | | |
| SIGNATURE | | | SIGNATURE | | |
| NAME | | | NAME | | |
| FIRM | | | FIRM | | |
| STREET ADDRESS | | | STREET ADDRESS | | |
| CITY/STATE/ZIP | | | CITY/STATE/ZIP | | |
| TELEPHONE NUMBER | FAX NUMBER | | TELEPHONE NUMBER | FAX NUMBER | |
| E-MAIL ADDRESS | | | E-MAIL ADDRESS | | |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | | | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | | |
| MEMBER OF TRIAL BAR?  YES ☐  NO ☐ | | | MEMBER OF TRIAL BAR?  YES ☐  NO ☐ | | |
| TRIAL ATTORNEY?  YES ☐  NO ☐ | | | TRIAL ATTORNEY?  YES ☐  NO ☐ | | |
| DESIGNATED AS LOCAL COUNSEL?  YES ☐  NO ☐ | | | DESIGNATED AS LOCAL COUNSEL?  YES ☐  NO ☐ | | |